**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| DAVID VANHORN, individually, and as a Representative of a Class of Participants and Beneficiaries of The Lamar Savings and Profit Sharing Plan,<br><br>Plaintiff,<br><br>v.<br><br>LAMAR MEDIA CORP., LAMAR MEDIA CORP. INVESTMENT COMMITTEE, and JOHN AND JANE DOES 1-30 IN THEIR CAPACITIES AS FIDUCIARIES OF THE LAMAR SAVINGS AND PROFIT SHARING PLAN,<br><br>Defendants. | Case No.<br><br>Damages and Injunctive Relief<br><br>Jury Trial Demanded<br><br>Complaint – Class Action |

## CLASS ACTION COMPLAINT

Plaintiff David Vanhorn ("Plaintiff"), individually and as a representative of a class of participants and beneficiaries of The Lamar Savings and Profit Sharing Plan (the "Plan"), brings this Class Action Complaint ("Complaint") under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (3) & 1109(a), against Lamar Media Corp. ("Lamar Media"), the Lamar Media Corp. Investment Committee (the "Committee"), and John and Jane Does 1-30 (collectively, "Defendants") for breaching their fiduciary duties in the management, operation, and administration of the Plan.

## INTRODUCTION

1. Defined contribution plans such as the Plan provide tax-advantaged retirement savings for millions of American workers. As of December 31, 2025, Americans held approximately $14.2 trillion in employer-sponsored defined contribution plans, according to

Federal Reserve Board data. In these plans, participants' retirement outcomes depend entirely on the performance of the investment options selected and monitored by plan fiduciaries.

2. Participants' retirement benefits "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). Because employers bear no direct financial risk from excessive fees or poor investment performance, participants shoulder the entire burden of imprudent decisions.

3. For that reason, ERISA imposes strict duties of loyalty and prudence—duties described as among "'the highest known to the law.'" *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 294 (5th Cir. 2000) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982)). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), and must employ the "care, skill, prudence, and diligence" of a knowledgeable professional managing a similar plan, *id.* § 1104(a)(1)(B).

4. Defendants failed to meet these obligations. Instead of prudently evaluating investment options in the best interests of Plan participants, Defendants maintained the T. Rowe Price Growth Stock Fund and, beginning in 2023, the T. Rowe Price Growth Stock Trust (together, the "TRP Growth Fund") in the Plan, despite this fund having proven that it could not beat its own chosen benchmark—the primary objective of actively-managed funds like the TRP Growth Fund —while simultaneously underperforming the vast majority of comparable funds that were widely available to Defendants throughout the Class Period.

5. In fact, for more than a decade, the TRP Growth Fund has consistently and significantly underperformed both its own benchmark as well as comparable peer funds. For example, since 2019, the TRP Growth Fund has failed to match or outperform its own benchmark,

the Russell 1000 Growth Index, on a trailing basis in *any* year. And when compared to all other funds within the Large Growth category, during *each* of the past 1-year, 3-year, 5-year, and 10-year periods, the TRP Growth Fund has ranked in *the lowest performance quartile* of its peer universe of large-cap growth funds.[1]

6. As a result, prudent fiduciaries and other investors are pulling their money out of the TRP Growth Fund at a staggering rate. Comparing new shares sold to existing shares redeemed, the TRP Growth Fund has experienced net redemptions in every one of the last ten years. These outflows are not marginal. In 2025 alone, the net outflows from the TRP Growth Fund total an astounding $3.4 billion. And between January 1, 2016 and December 31, 2025, the TRP Growth Fund has seen a net decrease in capital share transactions of over $33 billion in assets. A prudent fiduciary would view this market indicator as a major red flag.

7. Defendants' mismanagement of the Plan's investment lineup by maintaining the TRP Growth Fund in the Plan despite its chronic underperformance in contravention of the Plan participants' best interests constitutes a breach of the fiduciary duty of prudence in violation of 29 U.S.C. § 1104. As a result of Defendants' violations of ERISA, the Plan has suffered millions of dollars in losses.

8. To remedy Defendants' unlawful conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

---

[1] *T. Rowe Price Growth Stock Fund I Class*, Morningstar (Nov. 5, 2026), https://www.morningstar.com/funds/xnas/prufx/performance (reporting the following trailing returns for the TRP Growth Fund: YTD: lowest quartile (88th percentile); 1-Year: lowest quartile (87th percentile); 3-Year: lowest quartile (82nd percentile); 5-Year: lowest quartile (85th percentile); 10-Year: lowest quartile (79th percentile)). As of November 5, 2026, Morningstar reports that there are 1,025 funds in the Large Growth category.

## THE PARTIES AND THE PLAN

### PLAINTIFF

9. Plaintiff David Vanhorn resides in Grand Traverse County, Michigan. During the Class Period, Plaintiff was a participant in the Plan under 29 U.S.C. § 1002(7) and was invested in the TRP Growth Fund. Plaintiff brings this suit in a representative capacity on behalf of the Plan and its participants and beneficiaries, pursuant to 29 U.S.C. § 1132(a), seeking appropriate Plan-wide relief under 29 U.S.C. § 1109 to protect the interests of the Plan. Plaintiff suffered economic losses as a direct result of the conduct alleged herein.

### THE PLAN

10. Lamar Media created its 401(k) plan in 1988. It is an "employee pension benefit plan" under 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" under 29 U.S.C. § 1002(34). It is a 401(k) plan qualified under 26 U.S.C. § 401.

11. The Plan covers eligible employees and former employees of Lamar Media and its subsidiaries and affiliates. Eligible employees may make pre-tax contributions and may receive employer contributions from Lamar Media. Participants direct their retirement savings among a menu of designated investment alternatives. On information and belief, the Committee has the authority to add or delete Plan investment options at any time.

12. Until 2023, the Plan's investment options included the T. Rowe Price Growth Stock Fund, a mutual fund. In 2023, Defendants replaced the mutual fund with the T. Rowe Price Growth Stock Trust (Class D), a collective investment trust advised by T. Rowe Price Trust Company that uses the same portfolio manager, follows the same growth-stock strategy, and maintains essentially the same investments. While fund and trust investment vehicles are subject to differing public disclosure and advertising rules, for purposes of selecting and monitoring investment options made

available to plan participants both are essentially identical and share an identical investment strategy with identical end goals: balancing returns and risks constrained by investing in growth stock companies. For the purposes of a breach of prudence case, the switch from an investment strategy that uses a mutual fund vehicle to one that uses a trust vehicle does not impact or change ERISA's duties of prudence.

13. As of December 31, 2024, the Plan had 4,286 participants and total assets valued at approximately $517 million, placing it in the top 1% largest 401(k) plans in the United States.

## DEFENDANTS

14. Defendant Lamar Media is one of the largest outdoor advertising companies in the United States. It is incorporated in Delaware and maintains its principal place of business in Baton Rouge, Louisiana. Lamar Media is the "plan sponsor" of the Plan within the meaning of 29 U.S.C. § 1002(16)(B), and a "named fiduciary" of the Plan under 29 U.S.C. § 1102(a)(2). Lamar Media's Board of Directors is responsible for overseeing the Committee and its respective members. The Committee has authority to add or remove Plan investments at any time. During the relevant period, November 19, 2020 to the present (the "Class Period"), Lamar Media has had discretionary authority or control over the administration and management of the Plan, and discretionary authority or control over the Plan assets. 29 U.S.C. § 1002(21)(A). Based on its duties and authority with respect to the Plan, Lamar Media is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

15. At all relevant times, the Committee, through its members, managed and administered the Plan and has had discretionary authority or control over the assets of the Plan. 29 U.S.C. § 1002(21)(A). The Committee is overseen by Lamar Media's Board of Directors. Based on its duties and authority with respect to the Plan, the Committee is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

16. Defendants possessed the ability to delegate their fiduciary responsibilities to any other person, persons, or entity. Any individual or entity not named in this Complaint to whom Defendants delegated fiduciary functions or responsibilities are also fiduciaries of the Plan under 29 U.S.C. §§ 1002(21)(A) and 1105(c)(2). Because any such individuals that have been delegated fiduciary responsibilities are not currently known to Plaintiff, they are collectively named in this Complaint as Jane and John Does 1-30. Plaintiff reserves the right, once their identities are ascertained, to add them to the instant action.

17. Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)-(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

## JURISDICTION, VENUE, AND STANDING

18. This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

19. 29 U.S.C. § 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan.

20. This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the District in which the Plan was administered, where at least one of the alleged breaches took place, and where at least one Defendant may be found.

21. This Court has personal jurisdiction over each Defendant because each Defendant either resides in this District, transacts business in this District, or has sufficient minimum contacts with the forum.

22. As a participant in the Plan and investor in the TRP Growth Fund, Plaintiff has standing to bring claims on behalf of the Plan, pursuant to 29 U.S.C. § 1132(a)(2), and is a participant seeking appropriate Plan-wide relief under 29 U.S.C. § 1109. As such, Plaintiff brings this suit under 29 U.S.C. § 1132(a)(2) in a representative capacity on behalf of the Plan as a whole and seeks remedies under 29 U.S.C. § 1109 to protect the Plan.

## FACTUAL ALLEGATIONS

## I. ERISA'S FIDUCIARY STANDARDS.

### A. Overview of ERISA's Fiduciary Duty of Prudence.

23. ERISA reflects Congress's intent to safeguard the retirement assets of American workers. 29 U.S.C. § 1001(a). The "principal object of the statute is to protect plan participants and beneficiaries." *Boggs v. Boggs*, 520 U.S. 833, 845 (1997). To prevent the "misuse and mismanagement of plan assets," *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n.8 (1985), ERISA imposes strict fiduciary duties of loyalty and prudence—duties that courts have repeatedly described as "the highest known to the law." *Bussian*, 223 F.3d at 294 (quotation marks and citation omitted); *see also Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019); *Halperin v. Richards*, 7 F.4th 534, 546 (7th Cir. 2021); *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

24. The duty of prudence requires fiduciaries to exercise the "care, skill, prudence, and diligence" that a prudent person would utilize in managing a similar plan. 29 U.S.C. § 1104(a)(1)(B). This is not a lay person standard, but instead "requires expertise in a variety of

areas, such as investments." DEP'T OF LABOR, *Meeting Your Fiduciary Responsibilities* (Sept. 2017), at 2.[2]

25. The duty of prudence applies both to initial investment selection and ongoing monitoring. Fiduciaries must remove imprudent investment options when circumstances—such as sustained underperformance—demonstrate that such options are no longer in participants' best interests. *Tibble*, 575 U.S. at 529-30.

26. When deciding whether to select, retain, or remove a plan investment, the duty of prudence requires that fiduciaries "'utilize[] proper methods to investigate, evaluate and structure the investment; act[] in a manner as would others familiar with such matters; and exercise[] independent judgment when making investment decisions.'" *Bussian*, 223 F.3d at 299 (quoting *Laborers Nat'l Pension Fund v. Northern Trust Quantitative Advisors, Inc.*, 173 F.3d 313 (5th Cir.), *cert. denied sub nom. Laborers Nat'l Pension Fund v. American Nat'l Bank & Trust Co.*, 528 U.S. 967 (1999)).

27. In defined contribution plans, fiduciaries must create and maintain a diversified menu of prudent investment options. 29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii). These "designated investment alternatives" are the exclusive options through which participants may invest their retirement savings. Even in a defined contribution plan in which participants choose their investments, plan fiduciaries must conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options. *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022). Accordingly, fiduciaries must:

- thoroughly evaluate available investment options;

[2] DEP'T OF LABOR, *Meeting Your Fiduciary Responsibilities*, https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

- compare each option against reasonable alternatives;
- monitor performance and costs over time; and
- remove or replace investments that become imprudent.

28. Larger plans—such as the Plan—typically have access to superior, lower-cost institutional investment vehicles. Fiduciaries must leverage this scale for participants' benefit. *See* 44 Fed. Reg. 37221, 37224 (June 26, 1979).

**B. Fiduciary Liability Under ERISA.**

29. Under 29 U.S.C. § 1109, fiduciaries to the Plan are personally liable to make good to the Plan any harm caused by their breaches of fiduciary duty. Section 1109(a) provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).

30. The enforcement mechanism of 29 U.S.C. § 1109 is found in 29 U.S.C. § 1132(a)(2). That section authorizes participants and beneficiaries to bring civil actions to seek appropriate relief under 29 U.S.C. § 1109.

31. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. ERISA Section 405, 29 U.S.C. § 1105(a), provides a cause of action against a fiduciary for, among other things, knowingly participating in a breach by another fiduciary or enabling breaches by other fiduciaries.

32. Specifically, under 29 U.S.C. § 1105(a), a fiduciary shall be liable for a breach of fiduciary duty by a co-fiduciary if:

a. he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

b. by his failure to comply with [29 U.S.C. § 1104(a)(1)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

c. he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

*See* 29 U.S.C. § 1105(a).

## II. PRUDENT MANAGEMENT OF A DEFINED CONTRIBUTION PLAN INVESTMENT MENU.

### A. Fiduciary Considerations in Menu Construction.

33. Academic research consistently shows that participants rely heavily on fiduciaries' menu decisions and frequently use heuristics rather than informed analysis. Common behaviors include: "naïve diversification," allocating contributions evenly across all offered options regardless of quality. Jill E. Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes?*, 162 U. PA. L. REV. 605, 636-38 (2014); Shlomo Benartzi & Richard H. Thaler, *Naïve Diversification Strategies in Defined Contribution Plans*, 91 AM. ECON. REV. 79, 96 (2001).

34. Additionally, once an initial investment allocation has been chosen, 401(k) participants are prone to inertia, rarely changing investment allocations once selected even where the evidence demonstrates that they should. John Ameriks & Stephen P. Zeldes, *How Do Household Portfolio Shares Vary with Age?*, at 31, 48, Columbia University Working Paper (Sept. 2004) (finding that 48 percent of participants in the sample made no changes to their account in

ten years and 73 percent of participants made no change to their asset allocation); Julie Agnew *et al.*, *Portfolio Choice and Trading in a Large 401(k) Plan*, 93 AMER. ECON. REV. 193, 194 (Mar. 2003) (finding that 87 percent of 401(k) account holders made no trades in the average year and that the average 401(k) investor makes one trade every 3.85 years).

35. Because of these well-documented behavioral tendencies, fiduciaries must curate an investment menu composed of prudent, high-quality options. The fact that participants exercise "independent control" over the assets in their accounts "does not serve to relieve a fiduciary from its duty to prudently select and monitor any . . . designated investment alternative offered under the plan." 29 C.F.R. § 2550.404c-1(d)(2)(iv).

***i. Investment Structures and Asset Classes.***

36. Each designated investment alternative is generally a pooled investment vehicle, which typically includes mutual funds, collective investment trust funds ("CIT funds"), and separate accounts. INVESTMENT COMPANY INSTITUTE, *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans*, at 8 (Mar. 2018), www.ici.org/pdf/ppr_18_dcplan_profile_401k.pdf ("2018 ICI Study"); Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L.J. 1476, 1485 (2015) ("*Beyond Diversification*"). These investment vehicles generally charge ongoing asset-based fees deducted monthly or quarterly.

37. Major categories of investment options commonly include fixed investments (stable value funds, guaranteed investment contracts, and money market funds), bonds, and equities or stocks.

38. Equity investments are generally defined by three core characteristics: the geographic market in which investment managers deploy capital (such as domestic, international,

or global investments); the size of the companies they target (typically categorized as small-cap, mid-cap, or large-cap); and their investment style—growth, value, or blend. Growth funds pursue faster-growing companies, value funds focus on more established or undervalued companies, and blend funds invest in a mix of growth and value stocks, as well as companies that fall between those categories. Balanced funds are investment vehicles that allocate assets across multiple classes.

***ii. Active vs. Passive Management.***

39. All designated alternatives can be either passively or actively managed. Passive funds, popularly known as "index funds," seek to replicate the performance of market indices, such as the S&P 500, by purchasing a portfolio of securities matching the composition of the index itself. James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. PA. J. BUS. L. 483, 493 (2013). By following this strategy, index funds produce returns that are very close to the market segment tracked by the index. *Id.* Passive or index funds track broad market indices and provide predictable exposures at low cost.

40. Active funds seek market outperformance but typically carry higher fees. DEP'T OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 9 (Dec. 2011), http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf.

41. Active managers run the risk that their methods and analyses, including models, tools, and data, may be flawed or incorrect and may not achieve the fund's aim. This could cause the fund to lag its benchmark. Given that active managers are paid to beat their benchmarks, chronic underperformance is a red flag that suggests investors are not getting their money's worth and fiduciaries should consider other investment options.

***iii. Large-Cap Growth Funds.***

42. Large-cap funds like the TRP Growth Fund are typically comprised of the stock of large companies, *i.e.*, those in the top 70% of U.S. equity market capitalization.

43. Funds with a "growth" investment style invest in stocks of companies that are projected to grow faster than other stocks. Growth is defined based on fast growth (high growth rates for earnings, sales, book value, and cash flow) and high valuations (high price ratios and low dividend yields).

44. The principal aim of large-cap growth strategies is to provide investors with long-term growth of capital through investments in primarily large capitalization stocks.

**B. Fiduciary Duties as Applied to Investment Monitoring.**

45. Following the selection process, fiduciaries have a continuing duty to monitor investments and to remove imprudent ones. *Tibble*, 575 U.S. at 529 ("This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset."). For a fiduciary like the Committee, conducting ongoing independent investigations about the merits of investments is at the heart of the prudent person standard. *See, e.g.*, *Fink v. National Sav. & Tr. Co.*, 772 F.2d 951, 957 (D.C. Cir. 1985); *Whitfield v. Cohen*, 682 F. Supp. 188, 194 (S.D.N.Y. 1988).

46. Prudent fiduciaries compare the performance of the plan's funds against their selected benchmark as well as against comparable funds available in the marketplace. Underperformance of a fund for multiple consecutive quarters is a cause for scrutiny and investigation, including a careful analysis regarding the merits and options regarding replacement of the fund. Underperformance of three or more consecutive years is an unmistakable signal of failure that any competent and attentive fiduciary would act upon.

***i. Comparison to the Fund's Benchmark.***

47. As part of their monitoring process, prudent fiduciaries regularly compare the performance of a fund to its designated benchmark. As the Department of Labor recently stated:

> The plan fiduciary must appropriately consider and determine that each designated investment alternative has a meaningful benchmark, and compare the risk-adjusted expected returns of the designated investment alternative to the meaningful benchmark.

Fiduciary Duties in Selecting Designated Investment Alternatives, 91 Fed. Reg. 16088, 16136 (March 31, 2026) (Proposed Regulation).

48. Industry experts agree. For instance, Truist's fiduciary advisory group explains that "[a] benchmark is a measurement tool that provides a reference point for determining the success of an investment strategy and to confirm achievement of a goal."[3] PIMCO's advisory group similarly explains that "[a] benchmark serves a crucial role in investing" and is used by fiduciaries to measure the investment performance of a fund or portfolio.[4]

49. For years, the SEC has required fiduciaries to compare investment options "to an appropriate broad-based securities market index," *i.e.*, a benchmark.[5]

***ii. Comparison to Comparable Peer Funds.***

50. Prudent fiduciaries of a defined contribution plan also regularly compare the performance of each fund in the plan to the performance of comparable peer funds.

---

[3] *Benchmarking basics: A fiduciary perspective*, Truist, https://www.truist.com/resources/wealth/foundations-endowments/article/benchmarking-basics-a-fiduciary-perspective.

[4] *Understanding Benchmarks*, PIMCO, https://www.pimco.com/us/en/resources/education/understanding-benchmarks.

[5] *Tailored Shareholder Reports for Mutual Funds and Exchange-Traded Funds; Fee Information in Investment Company Advertisements,* Investment Company Act Release No. 34731 (Oct. 26, 2022), *accord* 29 C.F.R. § 2550.404a-5(d)(1).

51. According to the Government Accountability Office, "[o]nce the investment menu is selected, sponsors must monitor the fund options as part of their fiduciary obligations."[6] "As part of this monitoring of fund options, efforts of sponsors may include reviewing reports about the performance of the funds, holding meetings, placing poorly performing funds on a watch list, ultimately removing funds or replacing them with better options, and documenting their decisions." *Id.*

52. A peer fund is comparable if it has similar aims, risks, and potential rewards as those of the fund at issue.

53. When comparing a fund to comparable peer funds, prudent fiduciaries will examine performance figures measured on both an annual basis as well as on rolling three-, five-, and ten-year periods.

54. Prudent fiduciaries also commonly use risk-adjusted performance metrics to evaluate and monitor funds and investment managers. These performance metrics permit a fiduciary to examine not only the fund's performance in absolute terms—which is reflected in the annual and cumulative performance figures—but also the performance of the fund relative to the risks assumed, the fund's performance relative to an appropriate benchmark, and the consistency with which the fund has outperformed or underperformed that benchmark.

55. As noted in the Appendix to the March 2024 United States Government Accountability Office report to Congressional Requesters, some of the most important predictive risk-adjusted performance metrics that are used to determine the prudence of an investment option include the following:

---

[6] *Private Pensions – Fulfilling Fiduciary Obligations Can Present Challenges to 401(k) Plan Sponsors*, Report to the Chairman, Committee on Education and Labor, House of Representatives, United States Government Accountability Office (July 2008), https://www.gao.gov/assets/gao-08-774.pdf.

- **Alpha:** A measure of the difference between a fund's actual return and its expected performance, given its exposure to market risk as measured by beta.[7] Beta is a measure of a fund's sensitivity to market movements.[8] A positive Alpha indicates the investment generated returns greater than would be expected for the market risk assumed; a negative Alpha indicates that the investment generated returns below what would be expected for that level of risk. Alpha assists a prudent fiduciary to determine whether a fund's returns adequately compensate investors for the market risk they assume. Alpha is calculated as follows:[9]

$$\alpha_M = \bar{R}^e - \beta \bar{B}^e$$

where,

$\alpha_M$ = Monthly measure of Alpha

$\bar{R}^e$ = Average monthly excess return of the investment

$\bar{B}^e$ = Average monthly excess return of the benchmark

$\beta$ = Beta

- **Sharpe Ratio:** The Sharpe Ratio is the "industry standard for measuring risk-adjusted return"[10] that the United States Government Accountability Office describes as a metric used to determine "reward per unit of risk."[11] More

---

[7] United States Government Accountability Office Report to Congressional Requesters, *401(k) Retirement Plans* (March 2024) at 70, https://www.gao.gov/assets/870/868017.pdf.

[8] *Id.* at 70 n.4.

[9] *Custom Calculation Data Points*, Morningstar, https://morningstardirect.morningstar.com/clientcomm/customcalculations.pdf.

[10] *The Sharpe Ratio and the Information Ratio*, CFA Institute (2011) at 1, https://rpc.cfainstitute.org/sites/default/files/-/media/documents/code/gips/sharpe-ratio-and-the-information-ratio.pdf.

[11] United States Government Accountability Office Report to Congressional Requesters, *401(k)*

specifically, this metric evaluates the amount of excess return an investment generated for each unit of total risk assumed. It compares an investment's return above the risk-free rate to the volatility of the investment's returns, as measured by standard deviation. A high Sharpe Ratio indicates that an investment generated greater excess return relative to the amount of risk undertaken. This metric therefore permits a fiduciary to compare funds not merely according to their raw returns, but according to the efficiency with which those funds generated returns while exposing investors to risk. The Sharpe Ratio is calculated as follows:[12]

*Retirement Plans* (March 2024) at 60, https://www.gao.gov/assets/870/868017.pdf.

[12] *Custom Calculation Data Points*, Morningstar, https://morningstardirect.morningstar.com/clientcomm/customcalculations.pdf.

$$\text{Sharpe Ratio} = \frac{\left(\frac{\sum_{i=1}^{n} R_i}{n}\right) - \left(\frac{\sum_{i=1}^{n} RF_i}{n}\right)}{StDev}$$

where

$$StDev = \sqrt{\frac{1}{n-1} \bullet \sum_{i=1}^{n} (R_i - \bar{R})^2}$$

and

$StDev$ = standard deviation for the month

$R_i$ = return of the investment in time period $i$

$RF_i$ = return of the risk-free investment in time period $i$

$m$ = number of time periods in a year

$n$ = total number of time periods

$\bar{R}$ = Average return of the investment over the time period

- **Sortino Ratio**: The Sortino Ratio is similar to the Sharpe Ratio but it only uses the downside-risk portion of standard deviation in the denominator. As such, while the Sharpe Ratio shows the level of return in exchange for the total volatility of the fund, the Sortino Ratio shows the level of return in exchange for the downside volatility of the fund.[13] The Sortino Ratio is calculated as follows:[14]

---

[13] United States Government Accountability Office Report to Congressional Requesters, *401(k) Retirement Plans* (March 2024) at 60, https://www.gao.gov/assets/870/868017.pdf.

[14] *Custom Calculation Data Points*, Morningstar, https://morningstardirect.morningstar.com/clientcomm/customcalculations.pdf.

$$S = \frac{\langle R \rangle - R_f}{\sigma_s}$$

where

S = Sortino Ratio

<R> = Expected return

$R_f$ = Risk-free rate of return

$\sigma_d$ = Downside deviation

56. Additional risk-adjusted performance metrics used to evaluate the performance of investment managers and the prudence of an investment option include, but are not limited to, the following:

- **Information Ratio ("IR"):** IR is a metric that helps a fiduciary evaluate whether the manager of an investment option is beating a specific benchmark. An IR above 1.0 is evidence of excellent performance with consistent outperformance of the benchmark; an IR between 0.5 and 0.99 is evidence of reasonable manager skill; an IR of below 0.5 is evidence of weak performance as compared to the benchmark. A negative IR is evidence of consistent underperformance relative to the benchmark.
- **Batting Average:** Batting Average is a measure of a manager's ability to consistently beat the market. Batting Average is calculated by dividing the number of months in which the manager beat or matched the fund's primary benchmark index by the total number of months in the given period. For example, a manager who meets or outperforms the market every month in a given period would have a batting average of 1.000. A manager who meets or

outperforms the market half of the time during that period would have a batting average of .500.

57. Maximizing risk-adjusted performance is a primary consideration for prudent fiduciaries monitoring the performance of funds in a defined contribution plan. Poor performance in these metrics would trigger heightened monitoring, placement on a watch list, and, if poor performance continues, removal of the fund from the plan.

## III. The TRP Growth Fund.

58. The self-defined primary investment objective of the TRP Growth Fund is to "seek long-term growth of capital . . . by investing primarily in common stocks of well-established growth companies."[15]

59. The TRP Growth Fund is an actively managed fund. In other words, it relies on the professional judgment of a portfolio management team to make decisions about the specific investments within the fund.

60. According to T. Rowe Price, the TRP Growth Fund typically invests at least 80% of its assets in stocks of large-cap companies with growth characteristics. Specifically, "the fund generally seeks investments in stocks of large-cap companies with one or more of the following characteristics: strong cash flow and an above-average rate of earnings growth; the ability to sustain earnings momentum during economic downturns; and occupation of a lucrative niche in the economy and the ability to expand even during time of slow economic growth."[16]

61. As of December 31, 2025, T. Rowe Price compared the performance of the TRP Growth Fund to the performance of the Russell 1000 Growth Index, *i.e.*, its benchmark fund.

---

[15] *See, e.g.*, T. Rowe Price, Growth Stock Fund Fact Sheet, https://www.troweprice.com/financial-intermediary/us/en/investments/mutual-funds/us-products/growth-stock-fund.html.
[16] *Id.*

62. Accordingly, a potential reward of investing in the TRP Growth Fund is that it will generate positive investment returns that outperform the Russell 1000 Growth Index.

**IV. The TRP Growth Fund's Benchmark.**

63. T. Rowe Price designates the Russell 1000 Growth Index as the strategy benchmark for the TRP Growth Fund.

64. The Russell 1000 Growth Index is independently maintained by FTSE Russell, a wholly-owned subsidiary of the London Stock Exchange Group. FTSE Russell is a leading global provider of benchmarking, analytics, and data solutions for investors with over 30 years in the business.

65. The Russell 1000 Growth Index measures the performance of the large-cap growth segment of the U.S. stock market. It includes those Russell 1000 companies with relatively higher price-to-book ratios, higher forecast medium-term growth, and higher sales-per-share historical growth (i.e., growth companies).

**V. Peer Funds Comparable to the TRP Growth Fund.**

66. Like other large-cap growth funds, the TRP Growth Fund's primary risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

67. The TRP Growth Fund is not the only large-cap growth fund on the market with a substantially similar mix of aims, risks, and potential rewards as described above. As shown below, numerous substantially similar funds / substitutes have existed prior to and throughout the Class Period. The TRP Growth Fund dramatically and consistently underperformed these meaningful substitutes across a wide range of commonly and prudently utilized metrics.

68. Accordingly, all the investment options described below would be included in the peer consideration set for both benchmarking the TRP Growth Fund as well as serving as potential replacements for the TRP Growth Fund in the event it needed to be replaced.

69. Moreover, prudent fiduciaries would evaluate the performance of TRP Growth Fund in comparison to the alternative comparable substitute investment options described below.

70. As a result, the following investment options (collectively, the "Comparator Funds") are and have been both meaningful benchmarks as well as potential replacements for the TRP Growth Fund prior to and throughout the Class Period. Similarly, the index listed below is and has been a meaningful benchmark to evaluate the performance of the investment managers of the TRP Growth Fund prior to and throughout the Class Period.

- Fidelity Blue Chip Growth K Fund (FBGKX)
- Fidelity Growth Company K Fund (FGCKX)
- JPMorgan Growth Advantage R6 Fund (JGVVX)
- JPMorgan Large Cap Growth R6 Fund (JLGMX)
- Alger Focus Equity Fund Z (ALZFX)
- Voya Russell Large Cap Growth Index Port I Fund (IRLNX)

71. Additionally, because the investment strategies and aims of each of the comparable benchmarks and investable substitutes set forth below are designed to focus on large growth stocks, they are each required to share very similar asset allocations and, in fact, have had very similar asset allocations prior to and throughout the Class Period.

72. Prudent fiduciaries would have therefore included each of the comparable alternative substitute investment options when monitoring the TRP Growth Fund and considered each of the investable substitutes identified above as potential replacements.

**Comparator 1: Fidelity Blue Chip Growth K Fund (FBGKX)**

73. The Fidelity Blue Chip Growth K Fund (the "Fidelity Blue Chip Fund") has similar aims, risks, and potential rewards to those of the TRP Growth Fund.

74. Like the TRP Growth Fund, the Fidelity Blue Chip Fund is an actively managed large-cap growth fund.

75. The Fidelity Blue Chip Fund's aim is to seek capital appreciation. The Fidelity Blue Chip Fund pursues its aim by investing primarily in common stocks of companies that have above-average growth potential and normally invests at least 80% of its assets in blue-chip companies—companies that are well-known, well-established, and well-capitalized—which generally have large or medium market capitalizations.

76. Like the TRP Growth Fund, the Fidelity Blue Chip Fund identifies the Russell 1000 Growth Index as one of its benchmarks.

77. Morningstar classifies the Fidelity Blue Chip Fund as a large-cap growth fund.

78. Currently, approximately 84% of the Fidelity Blue Chip Fund's portfolio is invested in large-cap stocks, and 46% is invested in growth-oriented stocks. The remainder is invested in bonds, cash, and cash equivalents.

79. The Fidelity Blue Chip Fund's potential rewards are that the fund will generate positive investment returns that outperform its benchmark index. The Fidelity Blue Chip Fund's

principal risks are related to: (1) market risk; (2) issuer risk; and (3) the risks of investing in growth-oriented stocks.

80. The aims, risks, and potential rewards of the Fidelity Blue Chip Fund are similar to those of the TRP Growth Fund, given the similarities in the two funds' investment strategies and the types of stocks the two funds own. Moreover, both funds are actively managed investment options that seek to outperform relative to the same benchmark, the Russell 1000 Growth Index. These facts make the Fidelity Blue Chip Fund a meaningful comparator to the TRP Growth Fund.

**Comparator 2: Fidelity Growth Company K Fund (FGCKX)**

81. The Fidelity Growth Company K Fund (the "Fidelity Growth Fund") has similar aims, risks, and potential rewards to those of the TRP Growth Fund.

82. Like the TRP Growth Fund, the Fidelity Growth Fund is an actively managed large-cap growth fund.

83. The Fidelity Growth Fund's aim is to seek capital appreciation. The Fidelity Growth Fund pursues its aim by investing primarily in common stocks of companies that have above-average growth potential and normally invests at least 85% of its assets in blue-chip companies—companies that are well-known, well-established, and well-capitalized—which generally have large or medium market capitalizations.

84. The Fidelity Growth Fund identifies the Russell 1000 Growth Index as one of its benchmarks.

85. Morningstar classifies the Fidelity Growth Fund as a large-cap growth fund. Currently, approximately 85-90% of the Fidelity Growth Fund's portfolio is invested in large-cap stocks, with the overwhelming majority of those holdings reflecting growth-oriented investment characteristics. The remainder is invested in bonds, cash, and cash equivalents.

86. The Fidelity Growth Fund's potential rewards are that the fund will generate positive investment returns that outperform its benchmark index. The Fidelity Growth Fund's principal risks are related to: (1) market risk; (2) issuer risk; and (3) the risks of investing in growth-oriented stocks.

87. The aims, risks, and potential rewards of the Fidelity Growth Fund are similar to those of the TRP Growth Fund, given the similarities in the two funds' investment strategies and the types of stocks the two funds own. Moreover, both funds are actively managed investment options that seek to outperform relative to the same benchmark, the Russell 1000 Growth Index, and are growth funds that Morningstar places in its Large Growth category. These facts make the Fidelity Growth Fund a meaningful comparator to the TRP Growth Fund.

**Comparator 3: JPMorgan Growth Advantage R6 Fund (JGVVX)**

88. The JPMorgan Growth Advantage R6 Fund (the "JPMorgan Advantage Fund") has similar aims, risks, and potential rewards to those of the TRP Growth Fund.

89. Like the TRP Growth Fund, the JPMorgan Advantage Fund is an actively managed large-cap growth fund.

90. The JPMorgan Advantage Fund's aim is to seek long-term capital appreciation. The JPMorgan Advantage Fund pursues its aim by investing primarily in equity securities of large-capitalization companies whose market capitalizations are similar to those within the universe of the Russell 1000 Growth Index. The JPMorgan Advantage Fund typically invests in stocks of companies that are deemed to have a potential to exceed market expectations for a prolonged period of time.

91. Like the TRP Growth Fund, the JPMorgan Advantage Fund identifies the Russell 1000 Growth Index as one of its benchmarks. Morningstar classifies the JPMorgan Advantage

Fund as a large-cap growth fund. Currently, approximately 75–85% of the Fund's portfolio is invested in large-cap stocks, while the overwhelming majority of the portfolio reflects growth-oriented investments. The remainder is invested in cash and cash equivalents.

92. The JPMorgan Advantage Fund's potential rewards are that the fund will generate positive investment returns that outperform its benchmark index. The JPMorgan Advantage Fund's principal risks are related to: (1) market risk; (2) issuer risk; and (3) the risks of investing in growth-oriented stocks.

93. The aims, risks, and potential rewards of the JPMorgan Advantage Fund are similar to those of the TRP Growth Fund, given the similarities in the two funds' investment strategies and the types of stocks the two funds own. Moreover, both funds are actively managed investment options that seek to outperform relative to the same benchmark, the Russell 1000 Growth Index. These facts make the JPMorgan Advantage Fund a meaningful comparator to the TRP Growth Fund.

**Comparator 4: JPMorgan Large Cap Growth R6 Fund (JLGMX)**

94. The JPMorgan Large Cap Growth R6 Fund ("JPMorgan Large Cap Fund") has similar aims, risks, and potential rewards to those of the TRP Growth Fund.

95. Like the TRP Growth Fund, the JPMorgan Large Cap Fund is an actively managed large-cap growth fund.

96. The aim of the JPMorgan Large Cap Fund is to generate long-term capital growth in excess of its benchmark index. The JPMorgan Large Cap Fund pursues its aim, under normal circumstances, by investing at least 80% of its net assets in companies of a size similar to those in the Russell 1000 Growth Index, mainly in common stocks of large U.S. companies with a focus on growth stocks.

97. Like the TRP Growth Fund, the JPMorgan Large Cap Fund identifies the Russell 1000 Growth Index as one of its benchmarks.

98. Morningstar classifies the JPMorgan Large Cap Fund as a large-cap growth fund. Currently, approximately 80-90% of the JPMorgan Large Cap Fund's portfolio is invested in large-cap stocks, while the overwhelming majority of the portfolio reflects growth-oriented investments. The remainder is invested in cash and cash equivalents.

99. The JPMorgan Large Cap Fund's potential rewards are that the fund will generate positive investment returns that outperform its benchmark index. The JPMorgan Large Cap Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

100. The aims, risks, and potential rewards of the JPMorgan Large Cap Fund are similar to those of the TRP Growth Fund, given the similarities in the two funds' investment strategies and the types of stocks the two funds own. Moreover, both funds are actively managed investment options that seek to outperform relative to the same benchmark, the Russell 1000 Growth Index. These facts make the JPMorgan Large Cap Fund a meaningful comparator to the TRP Growth Fund.

**Comparator 5: Alger Focus Equity Fund Z (ALZFX)**

101. The Alger Focus Equity Fund Z (the "Alger Fund") has similar aims, risks, and potential rewards to those of the TRP Growth Fund.

102. Like the TRP Growth Fund, the Alger Fund is an actively managed large-cap growth fund.

103. The aim of the Alger Fund is to generate long-term capital growth in excess of its benchmark index. The Alger Fund pursues its aim, under normal circumstances, by investing in a

relatively concentrated portfolio of about 50 stocks that they believe have strong growth potential based on their fundamental research.

104. Like the TRP Growth Fund, the Alger Fund identifies the Russell 1000 Growth Index as one of its benchmarks.

105. Morningstar classifies the Alger Fund as a large-cap growth fund. Currently, approximately 80-90% of the Alger Fund's portfolio is invested in large-cap stocks, while the overwhelming majority of the portfolio reflects growth-oriented investments. The remainder is invested in cash and cash equivalents.

106. The Alger Fund's potential rewards are that the fund will generate positive investment returns that outperform its benchmark index. The Alger Fund's principal risks are related to: (1) market risk; (2) issuer risk; and (3) the risks of investing in growth-oriented stocks.

107. The aims, risks, and potential rewards of the Alger Fund are similar to those of the TRP Growth Fund, given the similarities in the two funds' investment strategies and the types of stocks the two funds own. Moreover, both funds are actively managed investment options that seek to outperform relative to the same benchmark, the Russell 1000 Growth Index. These facts make the Alger Fund a meaningful comparator to the TRP Growth Fund.

**Comparator 6: Voya Russell Large Cap Growth Index Port I Fund (IRLNX)**

108. The Voya Russell Large Cap Growth Index Port I Fund (the "Voya Fund") is a passively managed index fund that seeks to track the performance of a benchmark index that measures the investment return of large-capitalization growth stocks in the United States (i.e., the Russell 1000 Growth Index). The Voya Fund attempts to replicate the Russell 1000 Growth Index by investing all, or substantially all, of its assets in the stocks that make up the Index, holding each stock in approximately the same proportion as its weighting in the Index.

109. Currently, and based on the Voya Fund's index-tracking strategy and Morningstar's classification of the Fund within the "Large Growth" category, approximately 90% or more of the portfolio is invested in large-cap stocks, and virtually all of the equity holdings reflect growth-oriented investment characteristics. The remainder of the portfolio is generally invested in limited cash positions, cash equivalents, or ancillary holdings used for liquidity and index-tracking purposes.

110. The Voya Fund's potential rewards are that it will generate investment returns in line with the Russell 1000 Growth Index. The Voya Fund's principal risks are related to: (1) market risk; (2) issuer risk; and (3) investing in growth-oriented stocks.

111. By virtue of the similarities in their respective market capitalizations, the Voya Fund and the TRP Growth Fund share similar aims, rewards, and levels of risk. This makes the Voya Fund a meaningful Comparator for the TRP Growth Fund.

112. Indeed, by disclosing the Russell 1000 Growth Index to the public as the appropriate benchmark for the TRP Growth Fund, T. Rowe Price necessarily concludes that the Russell 1000 Growth Index shares similar aims, risks, and rewards as the TRP Growth Fund.

113. The Voya Fund is also a meaningful comparator because the TRP Growth Fund's own benchmark was the Russell 1000 Growth Index, and a low-cost index fund tracking that same benchmark would have provided participants with similar market exposure without paying for unsuccessful active management.

* * *

114. The Comparator Funds are not alleged to be identical to the TRP Growth Fund. They are alleged to be meaningful comparators because they occupied the same large-cap growth investment category, pursued substantially similar long-term capital growth objectives, exposed

participants to similar equity-market and growth-stock risks, and were available alternatives that a prudent fiduciary could have considered when evaluating whether continued retention of the TRP Growth Fund remained prudent.

## VI. DEFENDANTS' PROCESS FOR MONITORING THE TRP GROWTH FUND WAS IMPRUDENT.

115. Pursuant to ERISA, plan fiduciaries, such as Defendants, must (i) discharge their plan-related duties for the exclusive purpose of providing benefits to participants and defraying reasonable expenses of plan administration; (ii) act with the care, skill, prudence, and diligence under the circumstances then prevailing, that a prudent person acting in like capacity and experienced with such matters would use under the circumstances; (iii) diversify plan investments; and (iv) act in accordance with the terms of the plan, in-so-far as those terms comply with the statute. 29 U.S.C. § 1104. Moreover, fiduciaries are under a continuing duty to monitor plan investments. *Tibble*, 575 U.S. at 529 ("This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset.").

116. According to a regulation issued by the United States Department of Labor, procedural due diligence undertaken by plan fiduciaries is meant to ensure that plan-related investment decisions are reasonable and in furtherance of the retirement plan's purpose:

> "[A]ppropriate consideration" shall include, but is not necessarily limited to: (i) A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties) or menu, to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action compared to the opportunity for gain (or other return) associated with reasonably available alternatives with similar risks[.]

29 C.F.R. § 2550.404a-1(b)(2)(i).

117. In order to fulfill their ERISA duties and advance the purposes of the plan under their watch, fiduciaries, such as Defendants, should scrutinize each plan investment on a regular basis with appropriate consideration for, *inter alia*, the risk of loss, the opportunity for return, diversification, current and projected returns, as well as the costs associated with that investment.

118. For a prudent fiduciary, investment options that, on average, underperform their benchmarks over rolling three-, five-, or ten-year periods are generally candidates for removal. Prudent fiduciaries also examine common risk-adjusted performance metrics such as Alpha, Sharpe Ratio, and Sortino Ratio as part of an ERISA-compliant monitoring process. Upon information and belief, such guidelines are often outlined in a plan's investment policy statement.

119. Upon information and belief, a prudent investment review process for a large defined contribution plan would have required Defendants to evaluate whether the TRP Growth Fund continued to satisfy objective performance criteria, including rolling three-, five-, and ten-year returns relative to its stated benchmark, peer-group alternatives, risk-adjusted performance, fees, and the availability of materially similar lower-cost or better-performing replacements. Persistent failure across those metrics would require heightened review, watch-list placement, and, absent a documented fiduciary rationale, removal within a reasonable time.

120. Had Defendants fulfilled their fiduciary duties with the care and skill of prudent fiduciaries, they would have monitored the Plan in accordance with a reasonable investment review process, placed the TRP Growth Fund on a watch-list, investigated its persistent underperformance, compared it to readily available alternatives, and removed or replaced it well before, and certainly by the start of, the Class Period.

121. Indeed, by December 31, 2019, the TRP Growth Fund had underperformed each of the Russell 1000 Growth Index, the Fidelity Blue Chip Fund, the Fidelity Growth Fund, the

JPMorgan Advantage Fund, the JP Morgan Large Cap Fund, the Voya Fund, and the Alger Fund, over the preceding three-, five-, and ten-year periods.

122. By mid-2020, any fiduciary properly monitoring the Plan would have seen that the circumstances warranted the selection of a new option. Yet, Defendants failed to replace the TRP Growth Fund with any one of the many prudent alternatives available on the market through the present.

### A. The TRP Growth Fund Significantly Underperformed Its Own Benchmark for Over a Decade.

123. The TRP Growth Fund failed its primary objective: it could not beat its benchmark. From 2019 to 2025, the cumulative investment performance of the TRP Growth Fund lagged its designated benchmark—the Russell 1000 Growth Index—*over the preceding three-, five-, and ten-year periods* in all seven years. The strategy's underperformance was not isolated to a particular market cycle or short-term period. Rather, the underperformance persisted across multiple rolling time horizons and market environments, suggesting a sustained inability to add value relative to its own stated benchmark.

**T. Rowe Price Growth Stock / T. Rowe Price Growth Stock Tr-D**

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|
| 3 - Year Return | 73.03% | 77.30% | 115.02% | -1.62% | 5.61% | 14.99% | 120.34% |
| 5 - Year Return | 94.52% | 140.27% | 184.38% | 27.38% | 88.81% | 87.09% | 58.77% |
| 10 - Year Return | 305.75% | 375.16% | 475.94% | 189.90% | 207.35% | 265.82% | 281.88% |

**Russell 1000 Growth TR USD**

| Russell 1000 Growth TR USD | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|
| 3 - Year Return | 74.91% | 86.03% | 141.02% | 25.22% | 29.01% | 34.83% | 125.59% |
| 5 - Year Return | 97.90% | 159.38% | 209.08% | 68.21% | 143.68% | 138.26% | 103.97% |
| 10 - Year Return | 312.34% | 389.29% | 508.25% | 273.97% | 299.72% | 371.52% | 429.06% |

124. In addition, the published fund fact sheets for the TRP Growth Fund from Q3 2019 to Q4 2025 demonstrate that a continued investment in the TRP Growth Fund was not justified given its poor performance relative to the risks of the investment, as calculated using Alpha. Indeed, as the following table shows, from Q3 2019, *i.e.* before the Class Period, until Q4 2025, the TRP Growth Fund underperformed 26 out of 26 quarters under 3-year Alpha Ratio and 24 out of 26 quarters under 5-year Alpha Ratio. A prudent fiduciary reviewing TRP Growth Fund's performance against its benchmark would not have sat idly by as it continued to fail to justify its additional risk against its index benchmark.

| T. Rowe Price Growth Stock / Trust D | | |
|---|---|---|
| | 3-Year Alpha | 5-Year Alpha |
| Q3 2019 | (0.43%) | (0.57%) |
| Q4 2019 | (0.52%) | (0.61%) |
| Q1 2020 | (1.37%) | (1.15%) |
| Q2 2020 | (2.34%) | (1.44%) |
| Q3 2020 | (2.36%) | (1.68%) |
| Q4 2020 | (1.55%) | (1.76%) |
| Q1 2021 | (1.56%) | 0.18% |
| Q2 2021 | (1.52%) | 0.57% |
| Q3 2021 | (0.88%) | (0.38%) |
| Q4 2021 | (3.55%) | (1.27%) |
| Q1 2022 | (6.00%) | (3.37%) |
| Q2 2022 | (7.92%) | (5.33%) |
| Q3 2022 | (6.82%) | (5.12%) |
| Q4 2022 | (8.01%) | (5.61%) |
| Q1 2023 | (7.79%) | (5.83%) |
| Q2 2023 | (7.16%) | (5.65%) |
| Q3 2023 | (6.19%) | (4.54%) |
| Q4 2023 | (6.68%) | (5.50%) |
| Q1 2024 | (7.01%) | (5.22%) |
| Q2 2024 | (7.36%) | (5.28%) |
| Q3 2024 | (7.20%) | (5.00%) |
| Q4 2024 | (5.47%) | (5.15%) |
| Q1 2025 | (3.17%) | (4.93%) |
| Q2 2025 | (1.68%) | (5.08%) |
| Q3 2025 | (2.13%) | (5.26%) |
| Q4 2025 | (0.68%) | (5.23%) |

125. Thus, even before the Class Period began, the TRP Growth Fund had proven that it could not beat (or even match) its benchmark at even close to an acceptable rate—violating the basic investment principles that additional active management risk must be accompanied by an expectation of additional returns. Under the standards of a prudent fiduciary, it should have been removed from the Plan.

126. The same is true throughout the Class Period. With the exception of two quarters in early 2021, the TRP Growth Fund never outperformed its benchmark under 3- and 5-year Alpha Ratios. As such, Defendants' failure to remove it later into the Class Period and throughout the Class Period demonstrates a profound breakdown of the investment monitoring process.

127. In effect, the TRP Growth Fund ultimately offered a *lower* return for a *higher* degree of risk—the precise opposite of what any prudent and careful fiduciary would seek.

128. Based on the information available to Defendants with respect to TRP Growth Fund performance against its index benchmark, a plan fiduciary following the minimum standard of care for prudence, when evaluating whether to continue to retain the TRP Growth Fund would have determined that it violated bedrock investment principles and removed it at least by the middle of 2020, and/or all following consecutive quarters.

129. Any prudent fiduciary exercising prudent monitoring of its menu of investment options would have noticed that the TRP Growth Fund's consistent underperformance was causing damages to the Plan participants.

130. Fiduciaries following a prudent process in monitoring this investment would have recognized this and not have ignored TRP Growth Fund's shortcomings against its applicable index benchmark.

131. Had the Fiduciaries engaged in appropriate monitoring, they would have placed this fund on watch well before the Class Period began and removed it by, at least, Q2 of 2020.

132. Fiduciaries applying a prudent process could not sit idly by as an investment continuously failed to beat its applicable index benchmark. The TRP Growth Fund was simply not an appropriate option for the Plan.

133. Defendants' failure to notice or act upon the TRP Growth Fund's underperformance of its own index benchmark alone is cause enough to infer imprudent process.

**B. The TRP Growth Fund Significantly Underperformed Comparable Peer Funds.**

134. Defendants similarly failed to notice, or act on, the TRP Growth Fund's consistent underperformance relative to its peers.

135. The standard of care for plan fiduciaries selecting and monitoring investment options under the circumstances prevailing prior to and throughout the Class Period requires an evaluation of fund performance data and several commonly accepted metrics that serve as indicators/predictors as to whether it is reasonable to assume that any particular investment is likely to achieve its goals prospectively and is a reasonable option compared to alternatives that appear to be more likely to achieve their goals.

136. Through this lens, if a fund exhibits a persistent inability to exceed the returns of its market index and comparable peer funds across a broad range of metrics, prudent fiduciaries perform a detailed review of the fund and investigate potential replacements.

137. While each fiduciary may use a slightly different set of metrics weighted slightly differently, there is a set of critical metrics that are relatively more predictive of the results. In other words, regardless of the specific combination of metrics used, if an investment option rates as inferior or imprudent when evaluated by the metrics set forth below, they frequently also

rate as inferior or imprudent under any reasonably prudent combination of metrics and weightings.

138. Accordingly, a prudent plan fiduciary, when determining whether to retain a "Large Growth" Investment Option, would evaluate and compare the performance and commonly accepted investment performance metrics to meaningful benchmarks including peer alternatives/substitutes, such as the ones identified below, and the Russell 1000 Growth Index.

139. The TRP Growth Fund's severe and consistent underperformance, illustrated in the tables below, raises a plausible inference that the TRP Growth Fund could not have been determined to be prudent by any reasonably attentive fiduciaries during the Class Period.

140. Moreover, the TRP Growth Fund's severe underperformance illustrated in the tables below raises a plausible inference that the TRP Growth Fund could not have been expected to provide reasonable investment returns given the risks attendant to the investment and therefore was not a prudent investment prior to and throughout the Class Period.

141. The performance data below is based on publicly available fund-performance data, including annual and trailing return information available to retirement plan fiduciaries, investment consultants, recordkeepers, and other market participants during the relevant periods.

142. **Table 1.a,** below, illustrates the underperformance of the TRP Growth Fund from January 1, 2020, through December 31, 2025, relative to the Russell 1000 Growth Index and the six Comparator Funds. The TRP Growth Fund underperformed the Russell 1000 Growth Index by nearly 66 percentage points during this period and underperformed the Comparator Funds by substantially more.

**Table 1.a**
**January 1, 2020 - December 31, 2025**

| Fund | Annual Performance | | | | | | Cumulative Performance |
|---|---|---|---|---|---|---|---|
| | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | |
| T. Rowe Price Growth Stock/Trust D | 36.93% | 20.03% | -40.14% | 46.56% | 29.96% | 15.68% | **116.76%** |
| Russell 1000 Growth TR USD | 38.49% | 27.60% | -29.14% | 42.68% | 33.36% | 18.56% | **182.49%** |
| *+/- T. Rowe Price Growth Stock/Trust D* | *-1.56%* | *-7.57%* | *-11.01%* | *3.88%* | *-3.40%* | *-2.88%* | ***-65.72%*** |
| Fidelity Blue Chip Growth K | 62.38% | 22.81% | -38.40% | 55.76% | 39.80% | 19.99% | **220.93%** |
| *+/- T. Rowe Price Growth Stock/Trust D* | *-25.45%* | *-2.78%* | *-1.74%* | *-9.20%* | *-9.85%* | *-4.30%* | ***-104.17%*** |
| Fidelity Growth Company K | 67.69% | 22.73% | -33.74% | 47.33% | 37.31% | 24.42% | **243.20%** |
| *+/- T. Rowe Price Growth Stock/Trust D* | *-30.76%* | *-2.70%* | *-6.40%* | *-0.77%* | *-7.35%* | *-8.74%* | ***-126.44%*** |
| JPMorgan Growth Advantage R6 | 54.00% | 22.50% | -29.88% | 40.47% | 31.43% | 16.06% | **183.41%** |
| *+/- T. Rowe Price Growth Stock/Trust D* | *-17.07%* | *-2.46%* | *-10.26%* | *6.09%* | *-1.47%* | *-0.37%* | ***-66.65%*** |
| JPMorgan Large Cap Growth R6 | 56.42% | 18.79% | -25.21% | 34.95% | 34.17% | 14.40% | **187.85%** |
| *+/- T. Rowe Price Growth Stock/Trust D* | *-19.49%* | *1.24%* | *-14.93%* | *11.61%* | *-4.21%* | *1.28%* | ***-71.09%*** |
| Voya Russell Large Cap Growth Idx Port I | 38.46% | 30.66% | -30.03% | 45.99% | 34.60% | 18.12% | **193.85%** |
| *+/- T. Rowe Price Growth Stock/Trust D* | *-1.53%* | *-10.63%* | *-10.12%* | *0.57%* | *-4.64%* | *-2.44%* | ***-77.09%*** |
| Alger Focus Equity Z | 46.12% | 20.00% | -35.75% | 44.63% | 52.22% | 40.36% | **248.15%** |
| *+/- T. Rowe Price Growth Stock/Trust D* | *-9.19%* | *0.03%* | *-4.39%* | *1.93%* | *-22.27%* | *-24.67%* | ***-131.39%*** |

143. The cumulative performance numbers in **Table 1.a** highlight the magnitude of the underperformance of the TRP Growth Fund and reflect that the TRP Growth Fund remained an imprudent one for the Plan during the entire Class Period.

144. **Table 1.a** captures both the depth and breadth of the TRP Growth Fund's underperformance relative to six meaningful benchmarks.

145. All the data presented in **Table 1.a** was available in real time, not in hindsight, to Defendants throughout the Class Period.

146. Risk-adjusted performance metrics available to the Plan's fiduciaries prior to and throughout the Class Period also would have demonstrated to a prudent fiduciary, in real time, that maintaining the TRP Growth Fund in the Plan was imprudent.

147. As detailed in Appendix A and as summarized in the table below, at year-end 2019 and year-end 2020, the TRP Growth Fund underperformed the Comparator Funds in 94% of the commonly examined risk-adjusted performance metrics discussed herein.

**Performance Metrics Comparison Summary January 2019 - December 2020**

| Metric Analyzed | Total # of Metrics Analyzed Against Comparators | # of Metrics Underperformed | Percentage of Metrics Underperformed |
|---|---|---|---|
| 3 - Year Return | 12 | 12 | 100% |
| 5 - Year Return | 12 | 12 | 100% |
| Sharpe Ratio - 3 - Year | 12 | 11 | 92% |
| Sharpe Ratio - 5 - Year | 12 | 11 | 92% |
| Information Ratio 3 - Year | 12 | 12 | 100% |
| Information Ratio 5 - Year | 12 | 12 | 100% |
| Alpha 3 - Year | 12 | 11 | 92% |
| Alpha 5 - Year | 12 | 11 | 92% |
| Sortino Ratio - 3 - Year | 12 | 11 | 92% |
| Sortino Ratio - 5 - Year | 12 | 9 | 75% |
| Batting Average 3 - Year | 12 | 12 | 100% |
| Batting Average 5 - Year | 12 | 11 | 92% |
| **Total** | **144** | **135** | **94%** |

148. As such, a prudent fiduciary examining the risk-adjusted performance of the TRP Growth Fund and the Comparator Funds would have, at a minimum, placed the TRP Growth Fund on a watch list, if not removed and replaced the TRP Growth Fund before the Class Period began.

149. Throughout the Class Period, the TRP Growth Fund continued to underperform the Comparator Funds in these risk-adjusted performance metrics.

150. The TRP Growth Fund underperformed the Fidelity Blue Chip Growth K Fund in every metric throughout the Class Period.

**T. Rowe Price Growth Stock/Trust D & Fidelity Blue Chip Growth K Comparison**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 3 - Year Return | 1.63% | 2.49% | 8.91% | 9.55% | 7.64% | 3.78% | 5.52% | 7.61% |
| 5 - Year Return | 1.24% | 0.54% | 5.74% | 6.45% | 5.70% | 7.08% | 8.40% | 4.91% |
| Sharpe Ratio - 3 - Year | 0.089 | 0.086 | 0.231 | 0.204 | 0.286 | 0.164 | 0.220 | 0.097 |
| Sharpe Ratio - 5 - Year | 0.081 | 0.008 | 0.161 | 0.173 | 0.219 | 0.212 | 0.264 | 0.187 |
| Information Ratio 3 - Year | 0.325 | 0.532 | 1.586 | 1.572 | 1.524 | 0.875 | 1.263 | 1.413 |
| Information Ratio 5 - Year | 0.263 | 0.118 | 1.049 | 1.124 | 1.177 | 1.356 | 1.570 | 1.157 |
| Alpha 3 - Year | 1.20% | 1.27% | 5.21% | 4.27% | 7.09% | 3.39% | 4.84% | 1.99% |
| Alpha 5 - Year | 1.02% | 0.13% | 2.91% | 3.30% | 4.75% | 4.68% | 5.93% | 3.56% |
| Sortino Ratio - 3 - Year | 0.175 | 0.112 | 0.607 | 0.719 | 0.456 | 0.247 | 0.339 | 0.275 |
| Sortino Ratio - 5 - Year | 0.154 | -0.019 | 0.468 | 0.548 | 0.370 | 0.431 | 0.535 | 0.320 |
| Batting Average 3 - Year | 0.000 | 0.139 | 0.250 | 0.250 | 0.167 | 0.028 | 0.167 | 0.250 |
| Batting Average 5 - Year | 0.000 | 0.050 | 0.150 | 0.167 | 0.167 | 0.150 | 0.183 | 0.167 |
| # of Underperforming Metrics | 10 | 11 | 12 | 12 | 12 | 12 | 12 | 12 |
| # of Total Metrics | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| % of Underperforming Metrics | **83%** | **92%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** |

151. Similarly, the TRP Growth Fund underperformed the Fidelity Growth Company K Fund in every metric throughout the Class Period.

**T. Rowe Price Growth Stock/Trust D & Fidelity Growth Company K Comparison**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 3 - Year Return | 1.27% | 1.86% | 9.41% | 12.72% | 11.43% | 4.37% | 5.49% | 5.90% |
| 5 - Year Return | 1.31% | 1.49% | 7.22% | 6.86% | 7.57% | 9.16% | 9.15% | 5.71% |
| Sharpe Ratio - 3 - Year | -0.025 | -0.067 | 0.202 | 0.299 | 0.417 | 0.189 | 0.227 | 0.091 |
| Sharpe Ratio - 5 - Year | 0.002 | -0.022 | 0.169 | 0.125 | 0.284 | 0.300 | 0.308 | 0.236 |
| Information Ratio 3 - Year | 0.242 | 0.354 | 1.480 | 1.824 | 2.034 | 0.921 | 1.245 | 1.307 |
| Information Ratio 5 - Year | 0.241 | 0.283 | 1.167 | 1.060 | 1.447 | 1.645 | 1.688 | 1.282 |
| Alpha 3 - Year | -0.81% | -1.29% | 4.77% | 6.84% | 10.69% | 4.10% | 4.98% | 1.72% |
| Alpha 5 - Year | -0.13% | -0.52% | 3.18% | 2.69% | 6.37% | 6.86% | 7.00% | 4.62% |
| Sortino Ratio - 3 - Year | -0.044 | -0.179 | 0.580 | 1.260 | 0.692 | 0.280 | 0.341 | 0.200 |
| Sortino Ratio - 5 - Year | -0.033 | -0.102 | 0.461 | 0.465 | 0.497 | 0.620 | 0.638 | 0.396 |
| Batting Average 3 - Year | 0.056 | 0.083 | 0.139 | 0.250 | 0.194 | 0.028 | 0.028 | 0.111 |
| Batting Average 5 - Year | 0.033 | 0.067 | 0.150 | 0.150 | 0.133 | 0.117 | 0.117 | 0.117 |
| # of Underperforming Metrics | 7 | 6 | 12 | 12 | 12 | 12 | 12 | 12 |
| # of Total Metrics | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| % of Underperforming Metrics | **58%** | **50%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** |

152. The TRP Growth Fund underperformed the JPMorgan Growth Advantage R6 Fund in 92% of the risk-adjusted metrics throughout the Class Period.

**T. Rowe Price Growth Stock/Trust D & JPMorgan Growth Advantage R6 Comparison**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 3 - Year Return | 0.61% | 2.34% | 6.59% | 7.99% | 10.32% | 4.62% | 4.22% | -1.21% |
| 5 - Year Return | 0.25% | 1.00% | 4.28% | 4.92% | 7.33% | 6.90% | 6.20% | 3.29% |
| Sharpe Ratio - 3 - Year | -0.003 | 0.078 | 0.199 | 0.263 | 0.399 | 0.206 | 0.183 | -0.137 |
| Sharpe Ratio - 5 - Year | -0.012 | 0.030 | 0.138 | 0.168 | 0.309 | 0.281 | 0.254 | 0.166 |
| Information Ratio 3 - Year | 0.118 | 0.643 | 1.578 | 1.529 | 2.117 | 0.663 | 0.782 | -0.261 |
| Information Ratio 5 - Year | 0.053 | 0.221 | 0.927 | 1.074 | 1.565 | 1.426 | 1.326 | 0.589 |
| Alpha 3 - Year | -0.42% | 0.78% | 4.12% | 4.98% | 9.83% | 4.57% | 4.06% | -2.13% |
| Alpha 5 - Year | -0.24% | 0.35% | 2.24% | 2.73% | 6.64% | 6.04% | 5.41% | 3.17% |
| Sortino Ratio - 3 - Year | -0.014 | 0.108 | 0.493 | 0.922 | 0.654 | 0.313 | 0.286 | -0.321 |
| Sortino Ratio - 5 - Year | -0.066 | -0.017 | 0.346 | 0.469 | 0.534 | 0.586 | 0.531 | 0.295 |
| Batting Average 3 - Year | 0.056 | 0.139 | 0.194 | 0.167 | 0.056 | -0.056 | 0.111 | 0.083 |
| Batting Average 5 - Year | 0.017 | 0.083 | 0.167 | 0.117 | 0.083 | 0.083 | 0.100 | 0.017 |
| # of Underperforming Metrics | 6 | 11 | 12 | 12 | 12 | 11 | 12 | 7 |
| # of Total Metrics | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| % of Underperforming Metrics | **50%** | **92%** | **100%** | **100%** | **100%** | **92%** | **100%** | **58%** |

153. The TRP Growth Fund underperformed the JPMorgan Large Cap Growth R6 Fund in 90% of the risk-adjusted metrics throughout the Class Period.

**T. Rowe Price Growth Stock/Trust D & JPMorgan Large Cap Growth R6 Comparison**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 3 - Year Return | 0.71% | 4.66% | 8.88% | 8.26% | 12.14% | 4.40% | 5.87% | -2.65% |
| 5 - Year Return | 0.30% | 1.29% | 5.25% | 5.98% | 9.31% | 7.63% | 6.92% | 3.29% |
| Sharpe Ratio - 3 - Year | -0.014 | 0.156 | 0.255 | 0.254 | 0.475 | 0.202 | 0.268 | -0.165 |
| Sharpe Ratio - 5 - Year | -0.015 | 0.030 | 0.156 | 0.179 | 0.397 | 0.329 | 0.300 | 0.195 |
| Information Ratio 3 - Year | 0.148 | 0.802 | 1.592 | 1.430 | 2.359 | 0.764 | 1.331 | -0.482 |
| Information Ratio 5 - Year | 0.062 | 0.247 | 0.942 | 1.052 | 1.824 | 1.492 | 1.435 | 0.743 |
| Alpha 3 - Year | -0.38% | 2.72% | 5.73% | 5.34% | 11.68% | 4.70% | 5.88% | -2.21% |
| Alpha 5 - Year | -0.22% | 0.61% | 2.96% | 3.44% | 8.68% | 7.29% | 6.51% | 3.92% |
| Sortino Ratio - 3 - Year | 0.004 | 0.361 | 0.678 | 1.002 | 0.808 | 0.303 | 0.421 | -0.370 |
| Sortino Ratio - 5 - Year | -0.042 | 0.058 | 0.469 | 0.559 | 0.711 | 0.720 | 0.646 | 0.342 |
| Batting Average 3 - Year | -0.056 | 0.083 | 0.222 | 0.194 | 0.222 | 0.000 | 0.056 | -0.056 |
| Batting Average 5 - Year | -0.033 | 0.017 | 0.100 | 0.100 | 0.200 | 0.117 | 0.083 | 0.033 |
| # of Underperforming Metrics | 5 | 12 | 12 | 12 | 12 | 11 | 12 | 6 |
| # of Total Metrics | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| % of Underperforming Metrics | **42%** | **100%** | **100%** | **100%** | **100%** | **92%** | **100%** | **50%** |

154. The TRP Growth Fund underperformed the Voya Russell Large Cap Growth Index Fund in 93% of the risk-adjusted metrics throughout the Class Period.

**T. Rowe Price Growth Stock/Trust D & Voya Russell Large Cap Growth Idx Port I Comparison**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 3 - Year Return | 1.19% | 0.82% | 2.01% | 5.88% | 8.72% | 8.27% | 6.43% | 2.28% |
| 5 - Year Return | 0.91% | 0.92% | 1.95% | 2.90% | 6.28% | 6.66% | 6.65% | 6.55% |
| Sharpe Ratio - 3 - Year | 0.142 | 0.109 | 0.099 | 0.266 | 0.343 | 0.365 | 0.284 | 0.123 |
| Sharpe Ratio - 5 - Year | 0.122 | 0.119 | 0.147 | 0.151 | 0.280 | 0.294 | 0.290 | 0.323 |
| Information Ratio 3 - Year | 0.420 | 0.375 | 0.500 | 1.320 | 1.807 | 2.038 | 1.684 | 0.964 |
| Information Ratio 5 - Year | 0.463 | 0.436 | 0.452 | 0.842 | 1.368 | 1.528 | 1.650 | 1.779 |
| Alpha 3 - Year | 1.31% | 0.94% | 1.79% | 4.47% | 8.38% | 7.79% | 6.12% | 1.71% |
| Alpha 5 - Year | 1.01% | 1.10% | 2.07% | 2.03% | 5.88% | 6.12% | 5.99% | 5.98% |
| Sortino Ratio - 3 - Year | 0.244 | 0.044 | 0.187 | 0.629 | 0.542 | 0.558 | 0.434 | 0.317 |
| Sortino Ratio - 5 - Year | 0.242 | 0.216 | 0.335 | 0.300 | 0.453 | 0.548 | 0.554 | 0.549 |
| Batting Average 3 - Year | 0.056 | 0.167 | 0.083 | 0.083 | 0.000 | 0.000 | 0.000 | 0.056 |
| Batting Average 5 - Year | -0.017 | 0.050 | 0.050 | 0.100 | 0.083 | 0.000 | 0.000 | 0.067 |
| # of Underperforming Metrics | 11 | 12 | 12 | 12 | 11 | 10 | 10 | 12 |
| # of Total Metrics | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| % of Underperforming Metrics | **92%** | **100%** | **100%** | **100%** | **92%** | **83%** | **83%** | **100%** |

155. The TRP Growth Fund underperformed the Alger Focus Equity Z Fund in 99% of the risk-adjusted metrics throughout the Class Period.

T. Rowe Price Growth Stock/Trust D & Alger Focus Equity Z Comparison

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| 3 - Year Return | 1.08% | 2.27% | 4.84% | 3.97% | 4.60% | 1.86% | 7.49% | 15.53% |
| 5 - Year Return | 1.03% | 0.54% | 2.90% | 3.02% | 4.03% | 3.40% | 6.58% | 9.28% |
| Sharpe Ratio - 3 - Year | 0.061 | 0.131 | 0.216 | 0.218 | 0.181 | 0.080 | 0.310 | 0.300 |
| Sharpe Ratio - 5 - Year | 0.079 | 0.034 | 0.159 | 0.165 | 0.181 | 0.154 | 0.266 | 0.366 |
| Information Ratio 3 - Year | 0.228 | 0.629 | 1.279 | 0.776 | 0.845 | 0.175 | 1.608 | 1.995 |
| Information Ratio 5 - Year | 0.242 | 0.123 | 0.657 | 0.642 | 0.763 | 0.631 | 1.351 | 1.754 |
| Alpha 3 - Year | 0.57% | 1.59% | 4.25% | 4.06% | 4.64% | 1.87% | 6.94% | 6.66% |
| Alpha 5 - Year | 0.87% | 0.35% | 2.59% | 2.68% | 3.94% | 3.40% | 5.88% | 7.57% |
| Sortino Ratio - 3 - Year | 0.107 | 0.137 | 0.472 | 0.759 | 0.280 | 0.118 | 0.482 | 1.070 |
| Sortino Ratio - 5 - Year | 0.116 | 0.006 | 0.384 | 0.414 | 0.290 | 0.300 | 0.523 | 0.680 |
| Batting Average 3 - Year | -0.028 | 0.111 | 0.194 | 0.139 | 0.056 | -0.056 | 0.139 | 0.278 |
| Batting Average 5 - Year | -0.017 | -0.017 | 0.083 | 0.100 | 0.100 | 0.050 | 0.117 | 0.150 |
| # of Underperforming Metrics | 10 | 11 | 12 | 12 | 12 | 11 | 12 | 12 |
| # of Total Metrics | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| % of Underperforming Metrics | **83%** | **92%** | **100%** | **100%** | **100%** | **92%** | **100%** | **100%** |

156. The Comparator Funds listed in each of the above tables are managed by reputable investment advisers with significant assets under management and are available to all large retirement plans, including to Lamar Media's Plan. Defendants would not have had to scour the market to find them.

157. Defendants owed a fiduciary duty to remove the TRP Growth Fund within a reasonable time after it manifested poor performance. Yet, they retained the TRP Growth Fund year after year, even though it consistently failed its objectives.

158. Any prudent fiduciary monitoring the Plan in accordance with a reasonable investment review process would have placed the TRP Growth Fund on watch, investigated its persistent underperformance, compared it to readily available alternatives, and removed or replaced it well before, and certainly by, the start of the Class Period. No prudent fiduciary would have retained the investment option, like Lamar Media did, throughout the Class Period.

159. The inference of imprudence is reinforced by the duration, consistency, and magnitude of the TRP Growth Fund's underperformance. This is not a case based on a single

disappointing year, temporary volatility, or hindsight disagreement with a fiduciary's reasonable investment judgment.

160. By the start of the Class Period, the TRP Growth Fund had exhibited persistent underperformance across multiple trailing periods, against its own benchmark, and against readily available alternatives in the same investment category. A prudent fiduciary process would have required Defendants to identify those red flags, investigate whether continued retention was justified, and replace the investment option absent a documented, participant-focused rationale for keeping it in the Plan. Defendants failed to do this.

## VII. DEFENDANTS' BREACHES OF THEIR FIDUCIARY DUTIES CAUSED MILLIONS OF DOLLARS IN LOSSES TO THE PLAN AND ITS PARTICIPANTS AND BENEFICIARIES.

161. Defendants' failure to remove the TRP Growth Fund from the Plan cost Plan participants and beneficiaries tens of millions of dollars in retirement savings. On average, during the period from January 1, 2020, through December 31, 2024, the assets invested in the TRP Growth Fund averaged approximately $37.8 million.

162. **Table 1.b.** compares the investment growth of $32.2 million invested in the TRP Growth Fund as of January 1, 2020 to the growth of $32.2 million invested in each of the six Comparator Funds from January 1, 2020, through December 31, 2025.

163. As **Table 1.b** shows, participants would have substantially more dollars in retirement savings had Defendants replaced the TRP Growth Fund with any of the Comparator Funds or a fund that more closely matched the Russell 1000 Growth Index.

**Table 1.b**
**January 1, 2020 - December 31, 2025**

| Fund | Annual Performance | | | | | | Cumulative Performance | Annualized Performance | Growth of $32,285,896 |
|---|---|---|---|---|---|---|---|---|---|
| | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | | | |
| T. Rowe Price Growth Stock/Trust D | 36.93% | 20.03% | -40.14% | 46.56% | 29.96% | 15.68% | **116.76%** | **13.76%** | **$70.0 million** |
| Russell 1000 Growth TR USD | 38.49% | 27.60% | -29.14% | 42.68% | 33.36% | 18.56% | **182.49%** | **18.90%** | **$91.2 million** |
| *+/- T. Rowe Price Growth Stock/Trust D* | *-1.56%* | *-7.57%* | *-11.01%* | *3.88%* | *-3.40%* | *-2.88%* | ***-65.72%*** | ***-5.13%*** | ***-$21.2 million*** |
| Fidelity Blue Chip Growth K | 62.38% | 22.81% | -38.40% | 55.76% | 39.80% | 19.99% | **220.93%** | **21.45%** | **$103.6 million** |
| *+/- T. Rowe Price Growth Stock/Trust D* | *-25.45%* | *-2.78%* | *-1.74%* | *-9.20%* | *-9.85%* | *-4.30%* | ***-104.17%*** | ***-7.69%*** | ***-$33.6 million*** |
| Fidelity Growth Company K | 67.69% | 22.73% | -33.74% | 47.33% | 37.31% | 24.42% | **243.20%** | **22.82%** | **$110.8 million** |
| *+/- T. Rowe Price Growth Stock/Trust D* | *-30.76%* | *-2.70%* | *-6.40%* | *-0.77%* | *-7.35%* | *-8.74%* | ***-126.44%*** | ***-9.05%*** | ***-$40.8 million*** |
| JPMorgan Growth Advantage R6 | 54.00% | 22.50% | -29.88% | 40.47% | 31.43% | 16.06% | **183.41%** | **18.96%** | **$91.5 million** |
| *+/- T. Rowe Price Growth Stock/Trust D* | *-17.07%* | *-2.46%* | *-10.26%* | *6.09%* | *-1.47%* | *-0.37%* | ***-66.65%*** | ***-5.20%*** | ***-$21.5 million*** |
| JPMorgan Large Cap Growth R6 | 56.42% | 18.79% | -25.21% | 34.95% | 34.17% | 14.40% | **187.85%** | **19.27%** | **$92.9 million** |
| *+/- T. Rowe Price Growth Stock/Trust D* | *-19.49%* | *1.24%* | *-14.93%* | *11.61%* | *-4.21%* | *1.28%* | ***-71.09%*** | ***-5.51%*** | ***-$23.0 million*** |
| Voya Russell Large Cap Growth Idx Port I | 38.46% | 30.66% | -30.03% | 45.99% | 34.60% | 18.12% | **193.85%** | **19.68%** | **$94.9 million** |
| *+/- T. Rowe Price Growth Stock/Trust D* | *-1.53%* | *-10.63%* | *-10.12%* | *0.57%* | *-4.64%* | *-2.44%* | ***-77.09%*** | ***-5.92%*** | ***-$24.9 million*** |
| Alger Focus Equity Z | 46.12% | 20.00% | -35.75% | 44.63% | 52.22% | 40.36% | **248.15%** | **23.11%** | **$112.4 million** |
| *+/- T. Rowe Price Growth Stock/Trust D* | *-9.19%* | *0.03%* | *-4.39%* | *1.93%* | *-22.27%* | *-24.67%* | ***-131.39%*** | ***-9.35%*** | ***-$42.4 million*** |

## VIII. PLAINTIFF LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND RELATED FACTS UNTIL SHORTLY BEFORE FILING THIS COMPLAINT.

164. Plaintiff did not have knowledge of all material facts (including, among other things, the investment option and menu choices of fiduciaries of similar plans, fiduciary guidelines with respect to selection and monitoring of 401(k) menu options, expert studies on the persistence of investment underperformance, or the existence of superior options that utilize the same investment strategies as the TRP Growth Fund) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

165. Plaintiff did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting, monitoring, evaluating, and removing Plan investments), because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based on (among other things) the facts set forth above.

166. Documents and information relating to the management of the Plan during the relevant time (such as meeting minutes, committee charters, internal communications among Defendants, periodic investment reviews, investment policy statements, vendor contracts, and requests for proposals relating to any investment manager or fund searches) are not available prior to discovery. Although 29 U.S.C. § 1024(b)(4) requires plan administrators to make certain Plan governance documents available to plan participants upon written request, this provision does not include records of the day-to-day management of the Plan.

## CLASS ACTION ALLEGATIONS

167. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

168. In acting in his representative capacity for the Plan, Plaintiff seeks certification of this action as a class action pursuant to this statutory provision and Federal Rule of Civil Procedure 23. Plaintiff asserts his claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:

> All participants and beneficiaries of The Lamar Savings and Profit Sharing Plan who had account balances invested in the T. Rowe Price Growth Stock Fund or the T. Rowe Price Growth Stock Trust at any time on or after November 19, 2020, excluding Defendants and employees with responsibility for the Plan's investment or administrative functions (the "Class").

169. Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The Plan had approximately 4,200 participants during the applicable period. Fed. R. Civ. P. 23(a)(1).

170. Typicality: Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff was a Plan participant and suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiff consistently with other Class members with regard to the Plan. Defendants' imprudent decisions affected all Plan participants similarly. Fed. R. Civ. P. 23(a)(3).

171. Adequacy: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that he seeks to represent. Plaintiff participated in the Plan during the Class Period, had account balances in the TRP Growth Fund, had no interests that conflict with the Class, and is committed to the vigorous prosecution of this action on behalf of all Class members. Plaintiff has retained counsel experienced in ERISA and other complex class action litigation. Plaintiff does not have any conflicts of interest with any Class members that would impair or impede his ability to represent such Class members. Fed. R. Civ. P. 23(a)(4).

172. Commonality: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

a. Which Defendants are fiduciaries of the Plan;

b. Whether the Plan's fiduciaries breached their fiduciary duties by engaging in the conduct described herein;

c. Whether the Plan's fiduciaries are additionally or alternatively liable, as co-fiduciaries, for the unlawful conduct described herein pursuant to 29 U.S.C. § 1105;

d. Whether Defendants breached their duty to monitor other Plan fiduciaries;

e. The proper form of equitable and injunctive relief; and

f. The proper measure of monetary relief. Fed. R. Civ. P. 23(a)(2).

173. Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

174. Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as removal of Plan investments or removal of a Plan fiduciary, would be dispositive of non-party participants' interests. The accounting and restoration of the property of

the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

175. Class Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiff is unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
**Breach of Duty of Prudence by Failing to Remove an Imprudent Investment from the Plan Within a Reasonable Time**
**29 U.S.C. § 1104(a)(1)(B)**
**(On Behalf of Plaintiff and the Class Against Defendants)**

176. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs as if set forth fully herein.

177. At all relevant times during the Class Period, Defendants acted as fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A) by exercising authority and control with respect to the management of the Plan and its assets, by rendering investment advice or by having authority or

responsibility to render investment advice to the Plan, or by being designated in the governing Plan documents as a named fiduciary within the meaning of 29 U.S.C. § 1102(a).

178. 29 U.S.C. § 1104(a)(1)(B) requires a plan fiduciary to act with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

179. As such, under ERISA, Defendants, if acting as prudent fiduciaries, should have monitored the Plan in accordance with a reasonable investment review process and should have placed the TRP Growth Fund on watch, investigated its persistent underperformance, compared it to readily available alternatives, and removed or replaced it no later than the start of the Class Period.

180. Defendants breached their fiduciary duties through an imprudent process for investigating, evaluating, and monitoring investments. The faulty process resulted in a Plan that included a fund that suffered poor performance for well over a decade. Defendants failed to remove the TRP Growth Fund within a reasonable time despite historical underperformance relative to its benchmark index and peer funds.

181. By failing to remove or replace the TRP Growth Fund with (a) a better-performing actively managed investment option with similar aims and investment strategies or (b) with a less expensive and better-performing passively managed investment option, Defendants failed to discharge their duties with the care, skill, prudence, and diligence that a prudent fiduciary acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and like aims.

182. Defendants' breaches of their fiduciary duties have substantially impaired the Plan's use, value, and investment performance for all Class members.

183. As a direct and proximate result of Defendants' breaches of their fiduciary duties, the Plan has suffered millions of dollars of damages, which continue to accrue and for which Defendants are jointly and severally liable, pursuant to 29 U.S.C. §§ 1132(a)(2) and 1109(a).

184. Each Defendant is liable to make good to the Plan any losses resulting from the aforementioned breaches and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. Defendants are also subject to other Plan-wide equitable or remedial relief, as appropriate, including an injunction and the removal of fiduciaries.

185. As described herein, each Defendant also participated in the breaches of their co-defendants knowing that such acts constituted breaches of their fiduciary duties. Each Defendant also enabled their co-defendants to commit breaches of their fiduciary duties by failing to lawfully discharge their own fiduciary duties. Each Defendant knew of the breaches of their co-defendants, yet failed to make any reasonable effort under the circumstances to remedy those breaches. As such, each Defendant is liable for any losses caused by the breach of its co-fiduciary duties under 29 U.S.C. § 1105(a).

## COUNT II
**Failure to Adequately Monitor Fiduciaries**
**(On Behalf of Plaintiff and the Class Against Lamar Media Corp.)**

186. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs as if set forth fully herein.

187. At all relevant times during the Class Period, Defendant Lamar Media Corp. acted as a fiduciary within the meaning of 29 U.S.C. § 1002(21)(A) by exercising authority and control with respect to the management of the Plan and its assets, by rendering investment advice or by

having authority or responsibility to render investment advice to the Plan, or by being designated in the governing Plan documents as a named fiduciary within the meaning of 29 U.S.C. § 1102(a).

188. Defendant Lamar Media Corp. retains ultimate authority over the management of the Plan, appointed individuals who participated in the management of the Plan, received periodic investment performance reports, had the authority to receive periodic reports on other actions, and had a fiduciary duty to monitor appointed fiduciaries, including the members of the Committee.

189. A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA.

190. Defendant Lamar Media Corp. breached its fiduciary monitoring duties by, among other things:

a. Failing to monitor and evaluate the performance of the Plan's fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered substantial losses as a result of Defendants' imprudent actions and omissions;

b. Failing to monitor its appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein; and

c. Failing to remove fiduciaries whose performance was inadequate in that they continued to maintain investments that a prudent fiduciary would not have retained in the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

191. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses due to investment underperformance.

192. Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Defendant Lamar Media Corp. is liable to restore to the Plan all losses suffered as a result of the fiduciary breaches that resulted from its failure to properly monitor the Plan's fiduciaries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff David Vanhorn, individually and on behalf of the Plan and all similarly situated Plan participants and beneficiaries, prays for relief as follows:

A. A determination that this action may proceed as a class action under Rule 23(b)(1) or, in the alternative, Rule 23(b)(3), of the Federal Rules of Civil Procedure;

B. Designation of Plaintiff as a Class Representative and designation of Plaintiff's counsel as Class Counsel;

C. A declaration that Defendants have breached their fiduciary duties under ERISA;

D. A declaration that Defendant Lamar Media Corp. breached its fiduciary duty to monitor appointed fiduciaries;

E. An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described above, and to restore the Plan to the position it would have been in but for this unlawful conduct;

F. An accounting for profits earned by Defendants and a subsequent order requiring Defendants to disgorge all profits received from, or in respect of, the Plan;

G. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

H. An award of pre-judgment interest;

I. An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

J. An award of such other and further relief as the Court deems equitable and just.

**JURY DEMAND**

Plaintiff requests a trial by jury of all claims so triable.

Dated: November 19, 2026

By: */s/ Charles J. Stiegler*________________

Charles J. Stiegler, #33456
**STIEGLER LAW FIRM LLC**
318 Harrison Avenue, Suite 104
New Orleans, LA 70124
t: (504) 267-0777
f: (504) 513-3084
charles@stieglerlawfirm.com

Christopher M. Nienhaus*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, IL 60614
Tel: (708) 529-5418
chris@almeidalawgroup.com

* *pro hac vice application forthcoming*

*Counsel for Plaintiff & the Proposed Class*